UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION<br>in its capacity as Receiver for AmTrust Bank<br>550 17th Street NW<br>Washington, D.C. 20429-0002,<br><br>        Plaintiff,<br><br> – against –<br><br>US TITLES, INC.<br>7353 Little River Turnpike, Suite 101<br>Annandale, VA 22003<br><br>FIRST AMERICAN TITLE INSURANCE COMPANY<br>Bank of America Center – 16th Floor<br>1111 East Main Street<br>Richmond, VA 23219,<br><br>        Defendants. | Case No.: |

## COMPLAINT

Plaintiff, the Federal Deposit Insurance Corporation as Receiver for AmTrust Bank ("Plaintiff" or "FDIC-R"), by its undersigned attorneys, alleges against defendants US Titles, Inc. ("US Titles") and First American Title Insurance Company ("First American") as follows:

### Nature of the Case

1. This case involves two mortgage loans for the purchase of condominiums next door to one another. US Titles acted as the settlement agent for both sale transactions, which were shams. For each loan, First American issued Closing Protection Letters in which they agreed to reimburse AmTrust for actual losses incurred in connection with closings if US Titles breached certain contractual or tort duties.

1

**Jurisdiction and Venue**

2. This Court has subject matter jurisdiction for this action pursuant to 12 U.S.C. § 1811 *et seq.*, 12 U.S.C. § 1819(b)(1) and (2), and 28 U.S.C. §§ 1331 and 1345. Actions to which the FDIC-R is a party are deemed to arise under the laws of the United States. The FDIC, including in its capacity as Receiver, has the authority to sue and complain in any court of law, and is empowered to pursue claims held by the Bank, including its claims against the Defendant. 12 U.S.C. § 1819.

3. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to this claim occurred in this judicial district and the property that is the subject of the action is situated in this district.

**Parties**

4. The Federal Deposit Insurance Corporation ("FDIC") is a corporation organized and existing under the laws of the United States of America. Under the Federal Deposit Insurance Act ("FDIA"), the FDIC is authorized to be appointed as receiver for failed insured depository institutions. AmTrust Bank ("AmTrust") was a federally chartered savings bank with its principal place of business in Cleveland, Ohio. On December 4, 2009, AmTrust was closed by the Office of Thrift Supervision and the FDIC was appointed as Receiver pursuant to 12 U.S.C. § 1464(d)(2)(A) and 12 U.S.C. § 1821(c)(5). Under the FDIA, the FDIC as receiver succeeds to all claims held by banks for which it is the receiver. 12 U.S.C. § 1821(d)(2)(A)(i). Plaintiff owns the subject claims and has standing to prosecute this action as Receiver for AmTrust.

5. Defendant US Titles is, upon information and belief, a Virginia corporation with its principal place of business located in Annandale, Virginia.

6.	Defendant First American is a California corporation registered to do business in Virginia, with its principal place of business in Santa Ana, California. First American is engaged in the business of issuing title insurance policies and closing protection letters, among other things, and is doing business in Washington, D.C.

7.	All conditions precedent to the bringing of this action have been performed by Plaintiff except as to any acts or obligations Plaintiff was excused from performing by Defendants' breach or otherwise waived or excused.

*The Salazar Loan*

8.	On January 9, 2008, AmTrust funded a $585,000 mortgage loan for a purported borrower named Raomito Salazar (the "Salazar Loan"), to purchase a home located at 317 R Street, N.W., Unit 1, Washington, D.C. The purchase price as stated on the contract of sale was $650,000.

9.	As the closing agent on the Salazar Loan, US Titles was required to and did sign AmTrust's lender's closing instructions, entitled "Loan Closing and Funding Instructions" (the "Salazar Closing Instructions") for the closing of the Salazar Loan.

10.	Among other things, the Closing Instructions provided as follows:

   a. "Closing Agent has special knowledge that the Lender cannot obtain from any other source. Lender is relying on Closing Agent to communicate to Lender any material fact known or suspected which may arise during or out of the closing and settlement process. Closing Agent has a duty to provide Lender precise and correct information and to alert Lender to facts and events that might affect Lender's decision to make the loan. By way of example, . . . contributions of funds not identified in these or the Supplemental Closing Instructions by persons other than the Borrower. . . . If Closing Agent becomes aware of any such material information, the Closing Agent shall suspend loan closing and immediately disclose the information to Lender. (Closing Instructions, ¶ 1.1)

   b. "If Closing Agent has reason to believe there is a fraud or scheme related to the transaction, Closing Agent shall suspend loan closing and immediately notify Lender." (Closing Instructions, ¶ 1.3.)

   c. "If Closing Agent has knowledge . . . that any monies Borrower is required to pay or deposit at closing are not from the Borrower's own funds or a bona fide gift, the Closing Agent shall suspend loan closing and immediately notify Lender." (Closing Instructions, ¶ 1.10.)

   d. "All funds must pass through escrow and should be noted on the HUD-1 Settlement Statement. Copies of down payment checks or funds needed to close must be sent to Lender for approval prior to disbursement of loan proceeds. The name and address on the Borrower's down payment check must match the Borrower's name and address." (Closing Instructions, ¶ 1.12.)

A representative of US Titles signed the Salazar Closing Instructions on or about January 9, 2008. US Titles received valuable consideration in exchange for its agreement to abide by the Salazar Closing Instructions.

11. Salazar purportedly deposited $1,500 in earnest money with US Titles, and according to the HUD-1 Settlement Statement ("HUD-1"), Closing Instructions, and other documents prepared by US Titles, also brought $102,920 in cash to close ($63,500 being the balance of the down payment and $39,420 in closing costs). AmTrust provided financing in the amount of the $585,000 Salazar Loan.

12. US Titles received a $102,920 cashier's check, with Salazar's name typed on the remitter line; however, the check was purchased and delivered by Frank Davis, who was not a party to the Salazar Loan transaction.

13. US Titles did not deposit the check into the escrow as required and as represented to AmTrust, however. Instead, US Titles returned the cashier's check to Davis.

14. Davis then deposited the cashier's check back into his own bank account with the endorsement, "Not Used for Purpose Intended." US Titles's ledgers confirm that it did not process the $102,920 check through its escrow account.

15. Because US Titles never collected the required cash to close, the only true consideration exchanged was AmTrust's loan funds.

16.     Salazar defaulted on the loan after making only six mortgage payments.

17.     US Titles failed to follow the Salazar Closing Instructions.

18.     Under the Salazar Closing Instructions, US Titles was required to suspend the loan closing and immediately notify AmTrust that it did not collect the required $102,920 in cash to close from Salazar.  US Titles knew that (1)  the $102,920 cashier's check came from Frank Davis and not Salazar, (2) it did not deposit the $102,920 cashier's check into the escrow, and (3) it returned the cashier's check to Frank Davis.  Any one of these factors would have triggered US Title's obligation to halt the closing and notify AmTrust.  Instead of following the closing instructions, however, US Titles simply proceeded to close the Salazar Loan.

19.     In addition, the Salazar Closing Instructions set the sales price at $650,000.  US Titles was to obtain Am Trust's approval to close if there existed a material or significant change to the sale price. Here, because the $102,920 cashier's check was not actually part of the Salazar Loan transaction, the actual sales price was just $547,080.  Thus, the $585,000 Salazar Loan was secured by a property that was worth *less* than the amount of the loan.

20.     US Titles did not suspend the transaction, obtain AmTrust's approval, or even notify AmTrust about this decrease in the sales price. In failing to do so, US Titles violated the Salazar Closing Instructions.

21.     The HUD-1 Settlement Statement ("HUD-1") that US Titles created for the Salazar Loan certifies it is a true and accurate statement of all receipts and disbursements made by the buyer and seller, including payments to US Titles.  US Titles falsely certified on the HUD-1 that the statements contained therein were true and accurate accounts of the sales transaction.  However, both the purchase price and the cash to close were misrepresented on the HUD-1 for the Salazar Loan.

*Davis Loan*

22.     On April 14, 2008, AmTrust funded a $520,000 mortgage loan for Frank Davis (the "Davis Loan") to purchase a home located at 315 R Street, N.W., Unit 1, Washington, D.C. The purchase price as stated on the contract of sale was $650,000.  Per the HUD-1, US Titles collected cash to close from Davis in the amount of $179,885 (approximately $130,000 in down payment plus additional funds in closing costs), and AmTrust provided financing in the amount of the $520,000 Davis Loan.

23.     At closing, US Titles received a $179,885 cashier's check from Davis.  US Titles never deposited this check into the escrow, however.  Instead, US Titles returned the check to Davis.

24.     Davis then deposited the $179,885 check back into his own bank account with the endorsement, "Not Used for Purpose Intended."  US Titles's ledgers confirm that it did not process the $179,885 check through its escrow account.

25.     Because US Titles never collected the $179,885 in required cash to close, the only true consideration exchanged was AmTrust's loan funds.

26.     Thus, while US Titles represented to AmTrust throughout the loan documents that the purchase price of the Davis Property was $650,000, the actual purchase price was just $470,115 ($650,000 minus the uncollected $179,885 cash to close).  Because of US Titles's misrepresentations about its collection of the required cash to close, AmTrust was unaware that the $520,000 Davis Loan was secured by a property worth approximately *$50,000 less* than the amount of the loan.

27.     Davis defaulted on the loan after making only five mortgage payments.

28.     The HUD-1 that US Titles created for the Davis Loan certifies it is a true and accurate statement of all receipts and disbursements made by the buyer and seller, including payments to US Titles.  US Titles falsely certified on the HUD-1 that the statements contained therein (including the purchase prices) were true and accurate accounts of the sales transaction. However, both the purchase price and the cash to close were misrepresented on the HUD-1 for the Davis Loan.

29.     US Titles acted dishonestly and made material misrepresentations and omissions in handling AmTrust's funds and closing documents in connection with each closing.

*The Closing Protection Letters*

30.     Defendant First American issued title insurance policies for both the Salazar Loan transaction and the Davis Loan transaction.  As title insurer, First American also issued Closing Protection Letters ("CPLs") to AmTrust for each transaction:  the CPL for the Salazar Loan was issued on January 7, 2008, and the CPL for the Davis Loan was issued on March 27, 2008.  The CPLs constituted valid contracts.

31.     Both of the CPLs required First American to reimburse actual losses incurred by AmTrust and its successors and/or assigns as a result of certain actions of its approved agent, US Titles.  Specifically, the CPLs state in pertinent part, as follows:

> "When Title Insurance of First American Title Insurance Company is specified for your protection in connection with closings of real estate transactions in which you are . . . a lender secured by a mortgage of an interest in land, the Company, subject to the Conditions and Exclusions set forth below, hereby agrees to reimburse you for actual loss incurred by you in connection with such closings when conducted by [US Titles, Inc.] and when such loss arises out of:
>
>> 1.     Failure of [US Titles] to comply with your written closing instructions to the extent that they relate to . . .

7

>   (c) the collection and payment of funds due to [AmTrust], or
>
>   2.   Fraud or dishonesty of [US Titles] in handling [AmTrust's] funds or documents in connection with such closing.

32.   Here, coverage was triggered under both of the CPLs.  US Titles, as First American's approved agent, failed to comply with AmTrust's closing instructions and acted dishonestly by, *inter alia*, inaccurately disclosing the true sales prices for the properties securing both the Salazar Loan and the Davis Loan, misrepresenting that it collected the borrowers' required cash to close when it did not, and otherwise disguising the defalcation and/or misuse of AmTrust's loan proceeds.

33.   First American materially breached the CPLs by not reimbursing Plaintiff for the actual losses incurred by Plaintiff as a result of the misconduct of US Titles as set forth above.

## COUNT I
## BREACH OF CONTRACT
## (AGAINST US TITLES)

34.   Plaintiff incorporates the foregoing paragraphs as if fully set forth herein.

35.   US Titles agreed to act as settlement agent for AmTrust in connection with the closing of the Salazar Loan. Among other things, US Titles promised to abide by the closing instructions in exchange for certain fees.

36.   AmTrust fully performed and US Titles received the agreed-upon fees.

37.   US Titles breached the closing instructions on the Salazar Loan.

38.   Had US Titles complied with the closing instructions, AmTrust would not have funded the loans.

39. As a proximate result of US Titles's breach, plaintiff has suffered losses in an amount to be determined at trial but no less than the full loan amounts less any mitigation or foreclosure value of each property.

## COUNT II
## BREACH OF CONTRACT
## (AGAINST FIRST AMERICAN)

40. Plaintiff incorporates the foregoing paragraphs as if fully set forth herein.

41. First American agreed to reimburse AmTrust for actual loss under the Closing Protection Letters if certain conditions are met.

42. Those conditions were met on both loans.

43. The contracts were valid as First American received agreed-upon consideration.

44. AmTrust fully performed any obligations that it had under the Closing Protection Letters.

45. In refusing to pay under the Closing Protection Letters, First American breached the contracts.

46. As a proximate result of First American's breach, plaintiff has suffered losses in an amount to be determined at trial but no less than the full loan amounts less mitigation for each property.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in its favor against both defendants awarding plaintiff damages, costs, attorney's fees, and such other relief this Court deems proper.

Dated: December 3, 2012
       Washington, D.C.

                                **ELLENOFF GROSSMAN & SCHOLE LLP**
                                *Attorneys for Plaintiff*

                        By:    /s/ Eric Weinstein
                               Eric Weinstein (Bar No.: NY0158)
                               150 East 42nd Street
                               New York, New York 10017
                               Tel:  (212) 370-1300
                               Fax:  (212) 370-7889
                               Email:  eweinstein@egsllp.com