## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for AmTrust Bank,**<br><br>      **Plaintiff,**<br><br>      **v.**<br><br>**US TITLES, INC.,** *et al.***,**<br><br>      **Defendants.** | **Civil Action No. 12-1946 (JEB)** |

## <u>MEMORANDUM OPINION</u>

At a real-estate closing, the closing agent is typically supposed to take certain precautions that help a mortgage lender detect sham transactions. Despite explicit directives here to take such precautions, the closing agent in this case – US Titles, Inc. – allegedly failed to do so, and the fraudulent sale went through, undetected. The Federal Deposit Insurance Corporation, receiver for the lender bank, thus brought this suit against US Titles and another Defendant for breach of contract. US Titles now moves to dismiss the case for lack of personal jurisdiction, untimeliness, and failure to state a claim. Unpersuaded by any of these arguments, the Court will deny the Motion.

## I.       Background

Because the Motion at issue is a motion to dismiss, the Court draws the facts from the Complaint, assuming them to be true at this stage.

### A.   <u>Factual Background</u>

On January 9, 2008, a closing was held for a Washington, D.C., property located at 317 R Street, N.W., Unit 1. <u>See</u> Compl., ¶ 8. A closing (also known as a settlement) is "the final

transaction between the buyer and seller, whereby the conveyancing documents are concluded

and the money and property transferred." Black's Law Dictionary 291 (9th ed. 2009). The

purported purchaser was Raomito Salazar, with a stated sale price of $650,000. See Compl., ¶ 8.

Financing for the home came primarily from AmTrust Bank, which gave Salazar a $585,000

mortgage loan. See id. Salazar himself would pay the balance as a down payment. See id., ¶ 11.

     The closing agent on the Salazar transaction was US Titles. See id., ¶ 9. A closing agent

"handl[es] financial calculations and transfers of documents" during the closing. Black's Law

Dictionary 74. Because the lender is typically not present at a closing, AmTrust required US

Titles to make assurances about how the closing would be conducted. Those assurances, which

were put to paper in the Closing Instructions now in dispute, included the following provisions:

- "Closing Agent has special knowledge that the Lender cannot obtain from any other source. Lender is relying on Closing Agent to communicate to Lender any material fact known or suspected which may arise during or out of the closing and settlement process. Closing Agent has a duty to provide Lender precise and correct information and to alert Lender to facts and events that might affect Lender's decision to make the loan. By way of example, . . . contributions of funds not identified in these or the Supplemental Closing Instructions by persons other than the Borrower. . . . If Closing Agent becomes aware of any such material information, the Closing Agent shall suspend loan closing and immediately disclose the information to Lender."

- "If Closing Agent has reason to believe there is a fraud or scheme related to the transaction, Closing Agent shall suspend loan closing and immediately notify Lender."

- "If Closing Agent has knowledge . . . that any monies Borrower is required to pay or deposit at closing are not from the Borrower's own funds or a bona fide gift, the Closing Agent shall suspend loan closing and immediately notify Lender."

- "All funds must pass through escrow and should be noted on the HUD-1 Settlement Statement. Copies of down payment checks or funds needed to close must be sent to Lender for approval prior to disbursement of loan proceeds. The name and address on the Borrower's down payment check must match the Borrower's name and address."

Compl., ¶ 10 (quoting Closing Instructions, ¶¶ 1.1, 1.3, 1.10, 1.12) (omissions in original). US

Titles received "valuable consideration" for agreeing to the Closing Instructions. Id.

The closing itself, however, deviated from those Instructions.  First, Salazar was supposed to pay $102,920 at closing – $65,000 as his down payment, plus $39,420 in closing costs, minus $1500 in earnest money purportedly already deposited.  <u>See id.</u>, ¶ 11.  While US Titles did receive a cashier's check for $102,920, the check was purchased and delivered by Frank Davis, an unrelated third party.  <u>See id.</u>, ¶ 12.  Second, instead of depositing that check in escrow and then passing on the appropriate sum to the seller, US Titles simply returned the check to Davis.  <u>See id.</u>, ¶ 13.  Despite those irregularities, US Titles allowed the transaction to proceed.  <u>See id.</u>, ¶¶ 18, 20.  It subsequently misrepresented the transaction on the HUD-1 Settlement Statement, which was meant to summarize the receipts and disbursements during the closing.  <u>See id.</u>, ¶ 21.

After making six mortgage payments, Salazar, not surprisingly, defaulted on his loan from AmTrust.  <u>See id.</u>, ¶ 16.  The U.S. Office of Thrift Supervision later closed AmTrust, and the FDIC was appointed as receiver.  <u>See id.</u>, ¶ 4 (citing 12 U.S.C. §§ 1464(d)(2)(A), 1821(c)(5)).  Upon appointment, the FDIC succeeded to all claims held by AmTrust.  <u>See id.</u> (citing 12 U.S.C. § 1821(d)(2)(A)(i)).

B.  <u>Procedural Background</u>

The FDIC, as receiver for AmTrust, is suing US Titles for breach of contract.  It alleges losses from the Salazar loan, which was consummated only because US Titles breached the Closing Instructions.  <u>See</u> Compl., ¶ 39.  The suit also includes a second Defendant: First American Title Insurance Company, which allegedly issued closing-protection letters promising to reimburse AmTrust if US Titles violated the Closing Instructions.  <u>See id.</u>, ¶¶ 1, 30-32.  And the suit includes a second claim, brought against only First American, which includes another

scam allegedly perpetrated by Frank Davis.  See id., ¶¶ 22-29, 40-46.  As First American has

answered the Complaint, it plays no role in this Opinion.

US Titles now moves to dismiss the Complaint, arguing that the Court lacks personal

jurisdiction, that the statute of limitations has run, and that the Complaint fails to state a claim for

breach of contract.  "[T]o assist the Court in resolving the personal jurisdiction issue," the Court

ordered the FDIC to file the actual Closing Instructions.  Minute Order, Apr. 10, 2013.  The

FDIC has done so, and US Titles' Motion is now ripe.

## II.     Legal Standard

### A.  Personal Jurisdiction

Under Federal Rule of Civil Procedure 12(b)(2), a defendant may move to dismiss a suit

if the court lacks personal jurisdiction over it.  The plaintiff bears the burden of establishing

personal jurisdiction, FC Inv. Grp. LC v. IFX Mkts., Ltd., 529 F.3d 1087, 1091 (D.C. Cir. 2008),

and the requirements for personal jurisdiction "must be met as to each defendant."  Rush v.

Savchuk, 444 U.S. 320, 332 (1980).  In deciding whether the plaintiff has shown a factual basis

for personal jurisdiction over a defendant, the court resolves factual discrepancies in favor of the

plaintiff.  See Crane v. N.Y. Zoological Soc'y, 894 F.2d 454, 456 (D.C. Cir. 1990).  When

personal jurisdiction is challenged, "the district judge has considerable procedural leeway in

choosing a methodology for deciding the motion."  5B Charles A. Wright & Arthur R. Miller,

Federal Practice and Procedure § 1351 (3d ed. 2004).  The court may rest on the allegations in

the pleadings, collect affidavits and other evidence, or even hold a hearing.  See id.

### B.  Failure to State a Claim

Under Federal Rule of Civil Procedure 12(b)(6), a court must dismiss a claim for relief

when the complaint "fail[s] to state a claim upon which relief can be granted."  In evaluating a

motion to dismiss for failure to state a claim, the Court must "treat the complaint's factual allegations as true and must grant plaintiff the benefit of all inferences that can be derived from the facts alleged." Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (citation and internal quotation marks omitted); see also Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). A court need not accept as true, however, "a legal conclusion couched as a factual allegation," nor an inference unsupported by the facts set forth in the complaint. Trudeau v. FTC, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)). Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007), "a complaint must contain sufficient factual matter, [if] accepted as true, to state a claim to relief that is plausible on its face." Iqbal, 556 U.S. at 678 (internal quotation omitted). Though a plaintiff may survive a Rule 12(b)(6) motion even if "recovery is very remote and unlikely," the facts alleged in the complaint "must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555-56 (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).

A motion to dismiss under Rule 12(b)(6) must rely solely on matters within the pleadings, see Fed. R. Civ. P. 12(d), which includes statements adopted by reference as well as copies of written instruments joined as exhibits. See Fed. R. Civ. P. 10(c). Where the Court must consider "matters outside the pleadings" to reach its conclusion, a motion to dismiss "must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d); see also Yates v. District of Columbia, 324 F.3d 724, 725 (D.C. Cir. 2003).

## III.    Analysis

Because "jurisdiction generally must precede merits in dispositional order," Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 577 (1999), the Court will begin with personal jurisdiction,

5

then move to timeliness of the suit, and end on the merits of the breach-of-contract claim.  To

decide the personal-jurisdiction question under Federal Rule of Civil Procedure 12(b)(2), the

Court relies on three documents submitted by the FDIC.  See Opp., Exh. A (HUD-1 Settlement

Statement for Salazar Loan (Jan. 9, 2008)); Supp. Decl. of Eric Weinstein, ECF No. 16, Exh. A

(Supp. Closing Instructions for Salazar Loan); id., Exh. B (Master Closing Instructions for

Salazar Loan).  The Court, however, uses no outside documents to decide the Rule 12(b)(6)

issue, so the Motion remains one to dismiss.  Cf. Fed. R. Civ. P. 12(d) (relying on matters

outside pleadings converts Rule 12(b)(6) motion into motion for summary judgment).

   A.   Personal Jurisdiction over US Titles

   Personal jurisdiction determines the court's "authority over the parties . . . , so that the

court's decision will bind them."  Ruhrgas AG, 526 U.S. at 577.  A court may exercise two

forms of personal jurisdiction over a nonresident defendant: general and specific.  General

jurisdiction exists where a nonresident defendant maintains sufficiently systematic and

continuous contacts with the forum state, regardless of whether those contacts gave rise to the

claim in the particular case.  See Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S.

408, 414-15 & n.9 (1984).  "In contrast to general, all-purpose jurisdiction, specific jurisdiction

is confined to adjudication of issues deriving from, or connected with, the very controversy that

establishes jurisdiction."  Goodyear Dunlop Tires Operations, S.A. v. Brown, 131 S. Ct. 2846,

2851 (2011) (internal quotation marks omitted); see Helicopteros, 466 U.S. at 414 n.8.  The

FDIC here vies for only specific jurisdiction over US Titles.  "A plaintiff seeking to establish

specific jurisdiction over a non-resident defendant must establish that specific jurisdiction

comports with the forum's long-arm statute and does not violate due process."  FC Inv. Grp., 529

F.3d at 1094-95 (citation omitted).  The Court will take each requirement in turn.

The long-arm statute of the District of Columbia extends personal jurisdiction over a nonresident defendant where a claim "aris[es] from" the defendant's

> (1) transacting any business in the District of Columbia;
> (2) contracting to supply services in the District of Columbia;
> (3) causing tortious injury in the District of Columbia by an act or omission in the District of Columbia;
> (4) causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if [the defendant] regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia;
> (5) having an interest in, using, or possessing real property in the District of Columbia;
> (6) contracting to insure or act as surety for or on any person, property, or risk, contract, obligation, or agreement located, executed, or to be performed within the District of Columbia at the time of contracting, unless the parties otherwise provide in writing; or
> (7) marital or parent and child relationship in the District of Columbia . . . .

D.C. Code § 13-423(a).  In this case, the FDIC stresses the first, second, and sixth subsections of the D.C. long-arm statute.  The Court, however, need not venture beyond the first.  "[T]he 'transacting any business' provision embraces those contractual activities of a nonresident defendant which cause a consequence" in the District.  Mouzavires v. Baxter, 434 A.2d 988, 992 (D.C. 1981) (*en banc*).  The "nonresident defendant need not have been physically present in the District," and, "under certain circumstances, a single act may be sufficient to constitute transacting business."  Id.  In fact, the clause "is coextensive in reach with the personal jurisdiction allowed by the due process clause of the United States Constitution."  Shoppers Food Warehouse v. Moreno, 746 A.2d 320, 329 (D.C. 2000) (*en banc*).  "Consequently, the statutory and constitutional jurisdictional questions, which are usually distinct, merge into a single inquiry here."  United States v. Ferrara, 54 F.3d 825, 828 (D.C. Cir. 1995).  The "transacting any

business" subsection thus reaches US Titles if the D.C. consequences of the company's contractual activities make the exercise of personal jurisdiction here constitutional.

To comport with due process, a nonresident defendant must have "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (internal quotation marks omitted). Those guarantees are satisfied "if the defendant has 'purposefully directed' his activities at residents of the forum" and if "the litigation results from alleged injuries that 'arise out of or relate to' those activities." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 (1985) (quoting Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 774 (1984); Helicopteros, 466 U.S. at 414). When both conditions are met, a defendant "should reasonably anticipate being haled into court there." World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980).

In a contractual dispute, "[i]t is sufficient for purposes of due process that the suit was based on a contract which had substantial connection with that State." McGee v. Int'l Life Ins. Co., 355 U.S. 220, 223 (1957). Finding such a "substantial connection" requires looking beyond the formalities of the contract. "[C]onceptualistic theories of the place of contracting or of performance" and other "mechanical tests" fail to move the ball forward. Burger King, 471 U.S. at 478 (internal quotation marks and ellipsis omitted). The Supreme Court, for example, has rejected the proposition that "an individual's contract with an out-of-state party alone can automatically establish sufficient minimum contacts in the other party's home forum." Id. (emphasis in original). The D.C. Circuit, similarly, declined to give controlling weight to "the formation of the contract in the District of Columbia" when the parties' "courses of dealing . . . otherwise took place outside the District of Columbia." Helmer v. Doletskaya, 393 F.3d 201,

207 (D.C. Cir. 2004); see also id. ("Indeed, in the choice-of-law context, the place of contracting

standing alone is typically viewed as rather insignificant, especially when it was fortuitous,

whereas the place of negotiation and performance – in this case, Moscow – should generally

control.") (internal quotation marks omitted).  "Instead," the Supreme Court has

> emphasized the need for a highly realistic approach that recognizes
> that a contract is ordinarily but an intermediate step serving to tie
> up prior business negotiations with future consequences which
> themselves are the real object of the business transaction.  It is
> these factors – prior negotiations and contemplated future
> consequences, along with the terms of the contract and the parties'
> actual course of dealing – that must be evaluated in determining
> whether the defendant purposefully established minimum contacts
> within the forum.

Burger King, 471 U.S. at 479 (citation and internal quotation marks omitted); see, e.g., Creighton

Ltd. v. Gov't of Qatar, 181 F.3d 118, 127-28 (D.C. Cir. 1999).

At first glance, this contractual dispute presents a jumble of jurisdictions.  While the

buyer and seller of the property resided in D.C., the parties now enmeshed in litigation were

foreign: AmTrust, the lender now in FDIC receivership, was an Ohio corporation; US Titles, the

closing agent, was (and is) a Virginia corporation.  See HUD-1 Settlement Statement §§ D-F;

Compl., ¶ 5.  And although the real property changing hands – "the corpus of the contract," in

the words of the D.C. Circuit, Helmer, 393 F.3d at 206 – was located in the District, the closing

itself took place in Virginia.  See HUD-1 Settlement Statement §§ G-I.

A clearer picture emerges here from the "prior negotiations and contemplated future

consequences, along with the terms of the contract and the parties' actual course of dealing."

Burger King, 471 U.S. at 479.  As closing agent, US Titles was paid to perform a variety of

closing services.  Those services included tasks within the District and monetary distributions to

the D.C. government.  US Titles, for example, recorded the transfer of real property in the

District.  See HUD-1 Settlement Statement § L, *l*. 1112.  It paid the recording fees, fees for the

D.C. transfer stamp, and the recordation tax to the D.C. government.  See id. § L, *ll*. 1201-04.  It examined the property's title – again, presumably, in the District – and charged a fee for providing title insurance.  See id. § L, *ll*. 1103, 1108.  (According to the Complaint, First American actually issued the title-insurance policy, see Compl., ¶ 30, so US Titles presumably passed those fees along to that Defendant.)  US Titles was paid for all of these services at the closing.  See Supp. Closing Instructions at 4.

Because the consequence of the closing transaction was to transfer real property located in the District from one D.C. resident to another, and because the terms of the closing required US Titles to examine the title for that D.C. property, record the transfer with the D.C. recorder of deeds, and pay the District for the various taxes and fees associated with the transfer, the Court concludes that the closing and Closing Instructions had a substantial connection with the District. US Titles, in acting as closing agent, formed sufficient contacts with D.C. that it should have anticipated being haled into court here.

Another court presented with similar facts reached the same conclusion.  In that case, a Minnesota lawyer allegedly breached his fiduciary obligations to a client acquiring property in the District.  See Armenian Genocide Museum & Mem'l, Inc. v. Cafesjian Family Found., Inc., 607 F. Supp. 2d 185, 186-87, 190 (D.D.C. 2009).  The court, citing fewer contacts than have been noted here, found personal jurisdiction over the lawyer:  "The Court has little difficulty concluding that an attorney who represents a client in connection with the acquisition of real property in the District of Columbia can reasonably be expected to face a breach of fiduciary duty claim in the District of Columbia where the claim involves the same properties that were the focus of the representation."  Id. at 189.

US Titles protests that the Court, instead of considering the entire contract in its analysis of personal jurisdiction, should focus narrowly on the provisions of the Closing Instructions allegedly violated.  See Reply at 6-7.  It never explains why the Court should do so, however, and precedent treats the argument unkindly.  Every relevant case quoted above concentrates on the "contract" – not the provision allegedly breached.  See, e.g., Burger King, 471 U.S. at 478-82; McGee, 355 U.S. at 223-24; Helmer, 393 F.3d at 206-07; Creighton Ltd., 181 F.3d at 127-28. That focus on the entire contract better aligns with the requirement that courts should base personal jurisdiction on the business transaction and the parties' course of dealing, as "a contract is ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction."  Burger King, 471 U.S. at 479 (internal quotation marks omitted).  The spotlight here, therefore, properly falls on the entire Closing Instructions, not just the terms allegedly violated.

    B.  Statute of Limitations

US Titles next asks the Court to toss this suit for untimeliness.  The Salazar loan closed in January 2008, the FDIC was appointed as receiver of AmTrust in December 2009, and it filed this suit in December 2012.  US Titles at first insisted that that the D.C. statute of limitations for breach of contract applied here, which would require a suit within three years of the breach.  See D.C. Code § 12-301(7).  But as the FDIC points out, Congress has supplied a different rule when the FDIC acts as receiver: "[T]he applicable statute of limitations with regard to any action brought by the Corporation as conservator or receiver shall be . . . in the case of any contract claim, the longer of – (I) the 6-year period beginning on the date the claim accrues; or (II) the period applicable under State law," with the claim accruing on the later of "(i) the date of the appointment of the Corporation as conservator or receiver; or (ii) the date on which the cause of

action accrues." 12 U.S.C. § 1821(d)(14)(A)-(B).  The claim here thus accrued no earlier than the FDIC's appointment as receiver in December 2009.  The statute of limitations, then, has at least six years from that date to run, easily making the December 2012 Complaint here timely.

US Titles refuses to fold its losing hand, however.  It "requests that this Court apply the three-year period of limitations to bar this action" because breach-of-contract claims <u>against</u> the FDIC are subject to that statute of limitations.  Reply at 5 (citing <u>Youkelsone v. FDIC</u>, Civ. No. 09-1278, 2012 WL 6622619, at *6-7 (D.D.C. Dec. 20, 2012)).  According to US Titles, "It would be nonsensical to apply different periods of limitations depending upon whether FDIC was a plaintiff or a defendant."  <u>Id.</u>  Nonsensical or not, that is the rule Congress has made; absent a claim of unconstitutionality, judicial decision cannot override congressional command.

C.  <u>Failure to State a Claim</u>

Last, US Titles claims that the FDIC fails to properly allege an action for breach of contract.  Both parties assume that Virginia law governs the claim, so the Court will make the same assumption for purposes of this Motion.  To have a valid contract in Virginia, there must be "acceptance of an offer as well as valuable consideration."  <u>Montagna v. Holiday Inns, Inc.</u>, 269 S.E. 2d 838, 844 (Va. 1980) (citation omitted).  "The elements of a breach of contract action are (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation."  <u>Filak v. George</u>, 594 S.E. 2d 610, 614 (Va. 2004).  US Titles fights every step, asserting that: (1) closing instructions are never legally enforceable; (2) the Closing Instructions here lacked consideration; (3) the allegations of damages are insufficient; and (4) any damages were not caused by US Titles' breach.  The Court considers each challenge in order.

US Titles starts out swinging, declaring that "no Virginia court has concluded that closing instructions may constitute a contract giving rise to a legal obligation." Mot. at 12. Of course, it also finds no Virginia court suggesting that they do <u>not</u> constitute a contract. Nor, more fundamentally, does US Titles explain why closing instructions should – categorically – never give rise to a contract. Indeed, it "acknowledges that other jurisdictions have concluded that closing instructions could constitute a valid contract." <u>Id.</u> at 12 n.3; <u>see also</u> Opp. at 6-7 (citing <u>FDIC v. First Am. Title Ins. Co.</u>, No. SACV 10-713, 2011 WL 3737435, at *3 (C.D. Cal. Aug. 24, 2011) ("By signing the Closing Instructions, First American entered into a contractual relationship.")). Absent a reason to think otherwise, the Court declines to rule that closing instructions can never create a legal obligation in Virginia.

Next up is consideration. According to US Titles, the Closing Instructions here "do not constitute a contract because no consideration was given <u>by AmTrust to US Titles</u>." Mot. at 12 (emphasis added). Instead, US Titles explains, ordinarily "the settlement costs in a purchase of real estate are paid for by the borrower or seller, not the lender." <u>Id.</u> Contrary to US Titles' suggestion, however, consideration need not run from a plaintiff to a defendant to create a valid contract. When "others have agreed between themselves to bestow a benefit upon the third party but one of the parties to the agreement fails to uphold his portion of the bargain," the third-party beneficiary may sue to enforce the contract. <u>Envtl. Staffing Acquisition Corp. v. B & R Constr. Mgmt., Inc.</u>, 725 S.E. 2d 550, 553 (Va. 2012) (citation omitted). A leading treatise, indeed, has a section entitled "Irrelevance of Fact That Third Party Beneficiary Did Not Provide Consideration." 13 Richard A. Lord, <u>Williston on Contracts</u> § 37:3, at 18 (4th ed. 2000). As that treatise explains, "[I]n the typical third party beneficiary contract, the promisee supplies the consideration to the promisor, in exchange for which the promisor agrees to render a

performance to the third party beneficiary. . . .  So long as there is consideration for the

promisor's undertaking, the promise is enforceable by the third party beneficiary."  <u>Id.</u> at 19.  In

Virginia, "[w]hether a contract is intended for the benefit of a third person is generally regarded

as an issue of construction and the intention of the parties is determined by the terms of the

contract as a whole."  <u>Envtl. Staffing Acquisition Corp.</u>, 725 S.E. 2d at 553 (citation, brackets,

and ellipsis omitted).

       A reasonable inference from the Complaint here is that the lender, AmTrust, was an

intended beneficiary of the Closing Instructions.  <u>See, e.g.</u>, Compl., ¶ 10(a) ("'Closing Agent has

a duty to provide Lender precise and correct information and to alert Lender to facts and events

that might affect Lender's decision to make the loan.'") (quoting Closing Instructions, ¶ 1.1).

Because the Complaint alleges that "US Titles received valuable consideration in exchange for

its agreement to abide by the Salazar Closing Instructions," <u>id.</u>, ¶ 10, the allegations regarding

consideration here suffice.

       US Titles also raises two objections about the damages allegations.  First, it suggests that

perhaps AmTrust sold the note before Salazar's default, and thus the FDIC may lack standing to

bring suit.  <u>See</u> Mot. at 14.  Second, US Titles hypothesizes that, even after the default, AmTrust

may still have recovered the full value lent.  <u>See id.</u> at 13-14.  Federal Rule of Civil Procedure

8(a)(2), however, requires only "a short and plain statement of the claim showing that the pleader

is entitled to relief," and the allegations of damages here meet that standard.  The Complaint

alleges that "Salazar defaulted on the loan after making only six mortgage payments," Compl.,

¶ 16, and that the FDIC (as receiver for AmTrust) "has suffered losses . . . no less than the full

loan amounts less any mitigation or foreclosure value of [the] property."  <u>Id.</u>, ¶ 39.  While further

details about the actual losses would have been helpful, the reasonable inferences from those

allegations are that AmTrust retained the note, was forced to foreclose on the Salazar property after the default, and recouped less than its loan.  US Titles' speculation about other possibilities cannot overcome those reasonable inferences from the Complaint.

Finally, US Titles questions causation: "If FDIC is correct that the loans were part of a sham transaction, the sham would not have been thwarted merely by passing through US Titles' settlement account on the way into the account of the perpetrators of the sham . . . ."  Mot. at 14. That argument, however, ignores a key violation of the Closing Instructions: that a third party provided the money owed by the buyer/borrower.  See Compl., ¶¶ 10-12, 18.  If AmTrust knew that the buyer was not himself paying what he owed, but instead was relying on a third party to provide the money, it would have been alerted to the possibility of fraud.  See id., ¶ 18.  Indeed, the reason the Closing Instructions required US Titles to alert the bank in such circumstances was to detect fraud.  The Complaint here, therefore, alleges a sufficient causal connection between the breach and the damages.

## IV.     Conclusion

For the aforementioned reasons, the Court will deny Defendant US Titles' Motion to Dismiss.  A separate Order consistent with this Opinion will be issued this day.

/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date:  April 17, 2013